# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ZAREMBA GROUP, LLC,
a Michigan limited liability company,

      Plaintiff,

v.                                                                    Case No. 10-11245
                                                                      Hon. Lawrence P. Zatkoff

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for CITIZENS
STATE BANK,

      Defendant.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan,
on February 23, 2011.


PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE


## I.  INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Summary Judgment on Counts I,

VII, VIII, and IX [dkt 10]; Plaintiff's Motion for Summary Judgment to Affirm its Administrative

Claim [dkt 24]; Defendant's request for additional discovery with respect to Plaintiff's first motion

for summary judgment; and Defendant's Motion to Strike Jury Demand [dkt 9].  The parties have

fully briefed the motions.  The Court finds that the facts and legal arguments pertinent to the motions

are adequately presented in the parties' papers, and the decision process will not be aided by oral

arguments.  Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the

motions be decided on the briefs submitted.  For the following reasons, Plaintiff's Motion for

Summary Judgment on Counts I, VII, VIII, and IX [dkt 10] is GRANTED IN PART and DENIED IN PART, Defendant's request for additional discovery is DENIED, Plaintiff's Motion for Summary Judgment to Affirm its Administrative Claim [dkt 24] is DENIED as moot, and Defendant's Motion to Strike Jury Demand [dkt 9] is GRANTED.

## II.  BACKGROUND

### A. FACTUAL HISTORY

This action derives from Plaintiff's two certificates of deposit ("CDs"), which Plaintiff alleges are being held wrongfully by Defendant.  To form the two CDs at issue, Plaintiff initially opened two deposit accounts with Citizens State Bank ("CSB") on or about July 1, 2005, in the amount of $1,866,833.70.  Plaintiff alleges that Walter Zaremba pledged the CDs as collateral for his commercial loan without Plaintiff's authority.

### 1.  Plaintiff

Plaintiff is a Michigan limited-liability company formed on May 15, 1995.  The address of Plaintiff's registered office is 8692 M-32 Highway, Elmira, Michigan.  Its articles of organization were purportedly signed by Walter Zaremba ("Walter") and his wife, Yvonne Zaremba ("Yvonne"). Its operating agreement identifies Yvonne as the managing member of Plaintiff and as having a 75% ownership interest in Plaintiff.  The remaining five members identified on the operating agreement are Yvonne's children, including her son, James Zaremba ("James").  Additionally, Walter was identified in the operating agreement to act as the manager of Plaintiff in the event that Yvonne would be unable to serve as manager.

### 2.  Walter Zaremba's Commercial Loan

Walter is the husband of Yvonne.  According to Plaintiff, Walter has never been a member, an agent, or an authorized signer on the CDs for Plaintiff. Walter, however, also worked with CSB to obtain financing for his personal needs.  He purportedly worked with CSB's loan officers, Chris Olzem and Douglas Dunkelberg, to secure a large short-term commercial loan for himself. According to Defendant, Walter was notified that his proposed collateral to obtain the commercial loan was inadequate.  After such notice, Defendant alleges that Walter then notified CSB that a large sum of money would be deposited with CSB to act as collateral for his commercial loan. Consequently, Defendant contends that Walter and Yvonne arranged for the transfer of these funds to CSB, which amounted to $1,866,833.70.

On July 5, 2005, four days after deposit of the funds, CSB and Walter closed on his commerical loan.  Walter executed the following documents (collectively the "Loan Documents"), which identified 8692 M-32 Highway, Elmira, Michigan, as Walter's address:

> (1) A "Promissory Note" that evidenced a loan for $1,850,000, with a term that matched the maturity date of the CDs and affirmed the two CDs as collateral;

> (2) An "Assignment of Deposit Account" that assigned a security interest in the two CDs, which Walter signed in his individual capacity and as an agent for Plaintiff;

> (3) a "Limited Liability Company Resolution to Grant Collateral" that assigned the two CDs as collateral, which Walter signed in the capacity as a member of Plaintiff;

> (4) a "Collateral Receipt" that identified the two CDs as collateral for Walter's commercial loan; and

> (5) a "Disbursement Request and Authorization" that affirmed the loan was for short-term working capital and instructed the proceeds

3

to be paid to Joseph Zada, a non-party to this action.[1]

On July 15, 2005, Walter's commercial loan became due.  With Walter unable to repay, Olzem contacted Yvonne to extend the term.  At this point, Yvonne purportedly expressed concern about Walter's authority to pledge the CDs as collateral for his commercial loan.  Despite Yvonne's concern, its term was purportedly renewed, despite Walter's failure to repay the loan.

### 3. Plaintiff's Establishment of the Two CDs with CSB

Both CDs were established on or about July 1, 2005, when CSB and Plaintiff entered into a Time Certificate of Deposit Agreement ("CD Agreement").  As stated in the CD Agreement, the first CD contained Plaintiff's pension plan fund (the "Pension Fund CD") in the principal amount of $865,054.17.[2]  It contained two relevant terms: (1) early withdrawal of the funds before the CD's came due; and (2) Plaintiff also agreed to the terms in CSB's Time Deposit Agreement (the "Deposit Agreement").  The second CD was again established through a second CD Agreement; it contained the same terms as the first CD Agreement.  The second CD was identified as Plaintiff's special fund (the "Special Fund CD"), which was in the principal amount of $1,001,779.69.[3]  Pursuant to the Deposit Agreement, CSB has a right of set-off against the CDs for other debts that Plaintiff owes CSB.

---

[1] According to Misty McCrimmon's affidavit, who worked at CSB as a notary, Zada has an extensive lending relationship with the two CSB loan officers responsible for the transaction at issue in this case—Olzem and Dunkelberg.  Olzem and Dunkelberg, were purportedly planning on starting their own bank with Zada.  Currently, Olzem and Dunkelberg are under criminal investigation by the FDIC for actions taken while employed at CSB—including actions involving Plaintiff's CDs.

[2] Pursuant to an Order of the Macomb County Circuit Court, the Pension Plan CD has been placed in a third-party bank account jointly held by Plaintiff and CSB.

[3] The Special Fund CD was collected by CSB to pay a portion of debt that was outstanding on Walter's loan.  This CD was also subject to the Deposit Agreement.

On July 22, 2005, Yvonne and James signed two Commercial Time Deposit Signature Cards ("Signature Cards"). The Signature Cards identify Yvonne and James—no other person—as the authorized signers on the CDs.[4] At the time that they signed the Signature Cards, Yvonne and James also signed a CSB Bank Resolution by Association ("Bank Resolution"), establishing that the CDs were for Plaintiff. Walter's signature appears on the Bank Resolution.[5] Further, the July 22, 2005, Bank Resolution states that a person who signs it is "authorized to perform the powers indicated based on the number(s) following their respective names." The Bank Resolution lists the numerical values one through six. Each number corresponds to an enumerated set of powers that are explained in the document itself. The number two and the account numbers for both CDs appear across from James's and Yvonne's names.[6] No account numbers or powers are enumerated across from Walter's purported signature. The Bank Resolution also contains the language that Plaintiff "ratifies all transactions purportedly done on its behalf with [CSB] before these resolutions were delivered to [CSB]." Additionally, upon signing, Plaintiff also agreed to be governed by CSB's Commercial

---

[4]The Signature Cards also contained language, similar to that in the CD Agreement, that by signing the Signature Cards, Plaintiff agreed that the CDs will be governed by the Deposit Agreement.

[5]Walter contends that his signature was forged on the resolution. Furthermore, Walter disputes that he signed other documents relied on by CSB, claiming that the documents contain forgeries of his signature. Walter specifically identifies the following documents as containing these forged signatures: the July and October bank resolutions; the Limited Liability Company Resolution to Grant Collateral; and the Collateral Receipt. Walter's contentions are further supported by McCrimmon's affidavit, the employee at CSB that notarized Walter's loan documents. According to McCrimmon, she only notarized the Loan Documents because Olzem instructed her to do so, not because she witnessed Walter sign them. Moreover, similar transactions at CSB involving loans where the proceeds were paid to Zada purportedly involved forged signatures.

[6]The number two includes the powers to "sign and authorize checks, drafts, withdrawal slips, and any other orders for the payment of money, . . . or used to discharge or reduce any obligation of the signer."

5

Deposit Account Agreement and Disclosures (the "Commercial Account Agreement").[7]  In sum, the

parties' relationship is governed by terms contained in the CD Agreements, the Deposit Agreement,

the Signature Card, the Bank Resolution, and the Commercial Account Agreement.

### 4.  Plaintiff's Renewal of the CDs with CSB

Due to the CDs' short-terms, there were numerous renewals of the CDs.[8]  As such, Yvonne

and James were asked to sign new signature cards and a new bank resolution.  On October 14, 2005,

the new signature card was signed by Yvonne and James, and once again established that only

Yvonne and James were authorized signers on the CDs, not Walter.  A new bank resolution was also

signed by Yvonne and James, which Walter's purported signature also appears on.  Yvonne and

James retained the same power as expressed in the July bank resolution, and Walter again was not

provided with any powers.  As in the July 22, bank resolution, the October 14, bank resolution also

ratified all transactions purportedly done on behalf of Plaintiff with CSB.

### 5.  Plaintiff's Attempted Withdrawal of the CD's from CSB

At the conclusion of the Special Fund CD's term, on October 19, 2005, instead of renewing

the CDs, Yvonne purportedly attempted to remove the funds from the Special Fund CD.  Yvonne

alleges that her contact at CSB, Stelle Ruhlman, failed to return Yvonne's telephone calls regarding

---

[7]  The Commercial Account Agreement contains identical clauses to the Deposit Agreements regarding waiving the right to a jury trial and the right to set-off against Plaintiff's other debts owing to CSB.  The agreements do differ to the extent that the Deposit Agreement specifically focuses on the CDs, as opposed to the Commercial Account Agreement's general language about any account CSB offers to its customers.

[8]  For example, on August 17, 2005, the Pension Fund CD was replaced with a new CD subject to the same terms and conditions and had a 15-day single maturity.  This replacement of the mature CD with a new CD subject to a 15-day maturity term occurred from October 4, 2005, to February 27, 2006.  The same replacements occurred with the Special Fund CD.  Concerning the CD Agreements, the parties agree that they still govern the terms of the CDs.

6

the removal of the funds from the Special Fund CD.  Yvonne allegedly called on October 18, 19, 24, 25, and 26.  Ultimately, on or about October 27, 2005, she was purportedly informed that CSB considered both CDs to be collateral for a $1.85 million loan CSB made to Walter, of which the proceeds were paid to Zada.

On October 27, 2005, Yvonne allegedly mailed a letter to Olzem at CSB.  The letter stated that no member gave such authorization, and requested a wire transfer of the funds in the two CDs to Fifth Third Bank.  Before Yvonne received a response to her letter, Plaintiff's counsel sent a letter to CSB for clarification on the CDs' status on November 18, 2005.   On January 3, 2006, Dunkelberg, Senior Vice President and Senior Loan Officer for CSB, responded.  He explained in his letter CSB's position regarding Walter's authority to pledge the CDs as collateral:

> Based on [the articles of organization] and the conversations we had, all of which were with [Walter], we prepared resolutions for the opening of the deposit accounts which were the CD's [sic] initially opened July 1, 2005 . . . .  You'll notice the resolution includes [Walter]'s name.  The resolution was mailed to Yvonne due to the geographic distance separating them from our bank.  She was going to obtain the signatures and return the document to us.  She mailed it back without Walter's signature, but without any indication that he was not a member of [Plaintiff].  We then met with Walter to obtain his signature on the resolution to complete the document.
>
> While we should have obtained a copy of the current operating agreement to verify who could sign on behalf of the corporation, we relied upon our conversations with [Walter] that he could pledge the CD's [sic] and documented our deposit and loan agreements accordingly.  All of our discussions and negotiations were with [Walter], never with his wife or his son.

## 6.  Parties' Agreements Regarding Their Disputed Positions

On June 26, 2007, CSB and Walter, Yvonne, James, and Plaintiff entered into an agreement.

7

The agreement essentially acknowledged that: (1) Walter had defaulted on his $1,850,000 commercial loan; (2) CSB had collected the balance of Plaintiff's Special Fund CD to a portion of the outstanding balance on Walter's loan; (3) the Pension Fund CD would remain on deposit with CSB until further court order; (4) Plaintiff did not waive any rights, claims, or defenses with respect to the CDs; and (5) Plaintiff expressed that CSB had no right of ownership over the CDs. The parties entered a second agreement on February 28, 2008. The second agreement reiterated the parties' positions in the June 26, 2007, agreement, and CSB further acknowledged that it would return the Special Fund CD to Plaintiff when Walter paid the remaining balance owed on his defaulted loan. Finally, on October 13, 2009, the Pension Fund CD was ordered by the Macomb County Circuit Court to be transferred to an independent bank and be held in the joint name of CSB and Plaintiff pending further court order.

Ultimately, Plaintiff alleges that CSB executed an illegal "collection" of the Special Fund CD and that CSB refused to reverse that transaction to release Plaintiff's funds. Plaintiff also alleges that CSB wrongfully denied Plaintiff's withdrawal of the Pension Fund CD.

**B.  PROCEDURAL HISTORY**

On September 15, 2009, Plaintiff initiated this action against CSB in Macomb County Circuit Court. Subsequently, CSB was declared insolvent. On December 18, 2009, the Federal Deposit Insurance Corporation ("Defendant")[9] was appointed as receiver of CSB. On December 30, 2009, the Macomb County Circuit Court entered a stipulated order granting Defendant's motion to

---

[9] As receiver for CSB, the FDIC now stands in the shoes of CSB in this litigation, succeeds to CSB's liabilities, and must pay CSB's valid obligations. 12 U.S.C. §§ 1821(e), (g); *Tosco Corp. v. FDIC*, 723 F.2d 1242, 1247 ( 6th Cir. 1983) ("It can be said that as receiver the FDIC "stands in the shoes" of the Bank.").

substitute as Defendant and for a 90-day stay of proceedings. The 90-day stay was pursuant to the Financial Institutions Reform and Recovery Enforcement Act of 1989, 12 U.S.C. §§ 1812 *et seq.* ("FIRREA"). FIRREA regulates the process for the handling of claims against financial institutions placed in FDIC receivership. During the 90-day stay, Plaintiff filed an administrative claim on February 19, 2010, pursuant to FIRREA's claim process, with Defendant. This administrative claim sought relief similar to that which Plaintiff seeks in this case.

Thereafter, Defendant removed the state action in the Macomb County Circuit Court to this Court. Plaintiff then filed a motion for summary judgment. In response, Defendant filed a motion to stay the proceeding for an additional 180 days pursuant to FIRREA. The Court's September 23, 2010, opinion and order granted Defendant's motion to stay the proceedings. On November 9, 2010, Plaintiff filed a second motion for summary judgment requesting the Court to find Plaintiff's administrative claim was allowed due to Defendant's failure to take any action regarding Plaintiff's claim, or in the alternative, to decide its first motion for summary judgment pending before this Court.

Pertinent to Plaintiff's first motion for summary judgment, Plaintiff filed an amended complaint (the "complaint") that contains 17 counts. The relevant counts are as follows: Count I (Conversion based on Michigan's common law and conversion statute); Count VII (Breach of Contract); Count VIII (Unjust Enrichment, Wrongful Detainer, and Declaratory Relief as to Plaintiff's Pension Fund CD); and Count IX (Unjust Enrichment, Wrongful Detainer, and Declaratory Relief as to Plaintiff's Special Fund CD). Plaintiff seeks damages in the amount of at least $6,584,306.55, which includes: $2,194,768.85 for breach of contract, an order granting Plaintiff sole ownership and possession of the Pension Fund CD currently held at PNC Bank, treble damages

for CSB's conversion, pre-filing and post-filing interest, costs, and attorney fees.

### III.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or;
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323.  The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.  ANALYSIS

### A.  MOTION FOR SUMMARY JUDGMENT ON COUNTS I, VII, VIII, AND IX

### 1.     Count VII: Breach of Contract

To establish a breach of contract, a plaintiff must first establish the elements of a contract. *Pawlak v. Redox Corp*, 453 N.W. 2d 304, 307 (Mich. Ct. App. 1990). A valid contract requires "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja*, 468 N.W.2d 58, 60 (Mich. Ct. App. 1991).  Plaintiff must then establish a breach of the contract and damages resulting from such breach.  *Alan Custom Homes, Inc v. Krol*, 667 N.W.2d 379, 383 (Mich. Ct. App. 2003).

The Court finds that CSB did breach the CD Agreements between Plaintiff and CSB and, as such, caused damages to Plaintiff.  The parties do not deny that the CD Agreements created valid and enforceable contracts that permitted Plaintiff to withdraw the funds in the CDs upon its demand. Pursuant to the CD Agreements, CSB had a duty to hold Plaintiff's CDs for the benefit of Plaintiff, to pay interest to Plaintiff in an amount required by the CD Agreements, and to allow Plaintiff to withdraw its money from the accounts at the end of each CD's designated term.

Yvonne, acting as Manager of Plaintiff, allegedly attempted to withdraw funds from a CD (Plaintiff does not specify which one) on October 19, 2005.  On October 27, 2005, a letter directed

11

to Olzem requested wire-transfer of funds from both CDs.  CSB denied the withdrawal and wire-transfer, which, according to the CD Agreements, is a breach unless Yvonne's withdrawal was before the end of the CD Agreements' terms, or CSB had a separate debt from Plaintiff, in which CSB was authorized to use the CDs to set-off those obligations.

Defendant does not assert that Yvonne attempted to withdraw the CDs early, relying instead on the right to set-off provided by the CD Agreements.  Specifically, Defendant contends that Walter pledged the CDs as collateral for Walter's loan, and therefore, the CDs could be used to set-off Walter's commercial loan.  Yet, Plaintiff argues that Walter did not have the authority to pledge the CDs as collateral for Walter's loan.  Defendant, however, maintains that Walter had the apparent authority to pledge Plaintiff's CDs, and in the alternative, even if Walter lacked apparent authority, Plaintiff ratified Walter's conduct by signing the July and October bank resolutions.  For Defendant to establish its right to set-off Plaintiff's CDs against Walter's indebtness to CSB, Defendant needs to show that: (1) Walter had authority to pledge the CDs as collateral for his loan; or (2) Walter's conduct was later ratified by Plaintiff.  The record fails to demonstrate that Walter had such authority or that Plaintiff ratified Walter's actions.

### *(a).*   *Apparent Authority*

"Apparent authority may arise when acts and appearances lead a third person reasonably to believe that an agency relationship exists." *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992).  Apparent authority must be traceable to the principal, and cannot be established by the acts and conduct of the agent.  *Smith v. Saginaw Savs. & Loan Ass'n*, 288 N.W.2d 613, 617 (Mich. Ct. App. 1979).  A principal may be held liable for acts committed by its agent under the agent's apparent authority.  *Id.*

12

Upon Plaintiff's showing in its motion that Walter lacked apparent authority, Defendant presents evidence of acts or conduct that are purportedly traceable to Plaintiff, and thus, a third person would reasonably believe an agency relationship exists.  Specifically, Defendant insists that CSB was aware of the following facts that gave Walter apparent authority to pledge the CDs as collateral for his commercial loan: (1) he stated he would have funds deposited to serve as collateral, and consistent with his statements, on July 1, 2005, Yvonne transferred $1,866,833.70 to CSB; (2) Walter's loan documents represented he was an authorized member of Plaintiff, who was authorized to pledge the two CDs as collateral; (3) public records indicate that he was an organizer of Plaintiff; and (4) the address for Walter and Plaintiff are the same.  In its reply, Plaintiff maintains that these acts and conduct are not traceable to Plaintiff.

Reviewing the record, the Court does not find that such acts or conduct presented by Defendant are traceable to Plaintiff.  First, Dunkelberg admits in his January, 3, 2006, letter that he never spoke with Yvonne or James, and instead relied only on Walter's statements.  Second, Defendant relies on statements made by Walter, and the documents that Walter signed.  Even though Yvonne transferred money to CSB shortly after Walter made statements that a transfer would occur, the transfers were actions done by Yvonne on behalf of Plaintiff.  Defendant does not point to any evidence that Yvonne made representations to CSB that such transfers were because of Walter's commercial loan, or that any representations by Yvonne would lead a third person to believe that the funds were for Walter.

Third, the documents that created Plaintiff do not contain any evidence that would cause a third person to reasonably believe an agency relationship exists.  Walter was neither named as an active manger nor as a member of Plaintiff.  To the extent that Walter was listed as an organizer of

13

Plaintiff, merely being listed as an organizer does not suggest that the organizer is a member or manager of the corporation.  Mich. Comp. Laws § 450.4202 provides that, "One or more persons, who may or may not become members, may be the organizers of a limited liability company by filing executed articles of organization."  In this case, nothing on the record indicates that Walter became a member.  Fourth, the mere fact that Walter had the same address as Plaintiff is an incidental occurrence due to the fact that the managing member of Plaintiff (i.e., Yvonne) and Walter are husband and wife.  A reasonable jury would not believe that Walter was an agent of Plaintiff because they shared the same addresses, and it is not an act traceable to Plaintiff.

Furthermore, Mich. Comp. Laws § 440.3307(2)(b) provides:

> In the case of an instrument payable to the represented person or the fiduciary as such, *the taker has notice* of the breach of fiduciary duty if the instrument is
>
> (i) taken in payment of or *as collateral for a debt known by the taker to be the personal debt* of the fiduciary,
>
> (ii) taken in a transaction known by the taker to be for the *personal benefit* of the fiduciary, or
>
> (iii) *deposited to an account other than an account of the fiduciary*, as such, or an account of the represented person.

(emphasis added.)  Here, even assuming Walter was a fiduciary of Plaintiff, Defendant was on notice of a possible breach of his fiduciary duty because the record shows that: (1) the CDs are owned by Plaintiff; (2) Walter pledged the CDs as collateral; (3) Walter's pledge was for a personal loan; and (4) the proceeds of the loan, which the CDs were pledged as collateral, were paid to Zada, not a fiduciary or represented person of Plaintiff.  As such, even Michigan statutory law required Defendant to do a more thorough review to determine if Walter had authority to pledge Plaintiff's CDs—at least more than just relying on his actions and conduct.  *See id*. at § 440.3307(2)(b).

14

Typically, the issue of the existence of any agency relationship is a question of fact for the jury. *Mich. Nat'l Bank v. Kellam*, 309 N.W.2d 700, 704 (Mich. Ct. App. 1981); *Garey v. Kelvinator Corp.*, 271 N.W. 723, 729 (Mich. 1937). However, in this case, Defendant has failed to raise any issues of fact concerning the authority of Walter to act on behalf of Plaintiff. Therefore, the Court finds as matter of law that Walter lacked apparent authority to pledge Plaintiff's CD as collateral for his commercial loan.

### *(b).*    *Ratification*

Acts of an agent are deemed to be ratified by a principal, unless the principal expressly repudiates the agent's act within a reasonable time after obtaining knowledge of such acts. *Sullivan v. Bennett*, 246 N.W. 90, 91 (Mich. 1933). Knowledge requires knowledge of the facts and surrounding circumstances of the agent's acts. *Roney v. Nazzara*, 29 N.W.2d 259, 262 (Mich. 1947); *Selected Invs. Co. v. Brown,* 284 N.W. 918, 921 (Mich. 1939).

Defendant argues that more than two weeks after the loan to Walter was completed, Yvonne completed a resolution as managing member of Plaintiff, which expressly stated that Plaintiff ratified all transactions purportedly done on its behalf with CSB before completion of such resolution. A similar resolution was completed on October 14, 2005, more than three months after the closing of Walter's loan and the pledge of the CDs as collateral. According to Defendant, Yvonne had full knowledge of Walter's actions prior to execution of the resolutions. Defendant relies on *Inn Foods v. Equitable Co-Operative Bank*, 45 F.3d 594 (1st Cir. 1995).

In *Inn Foods*, the company president endorsed a corporate check and then deposited the check into his personal bank account—an action that was unauthorized at the time. *Id.* at 595. The company president then became uncomfortable with the transaction in light of the amount of the

15

corporate check that he deposited in his account, and thus informed the company's counsel. *Id.* at 595–96. The company then passed a corporate resolution by unanimous vote of the board of directors ratifying the action. *Id.* at 596.

Defendant's arguments are unpersuasive. Other than the two bank resolutions signed by Yvonne, which, according to Defendant, ratifies Walter's actions, Defendant fails to present any evidence that Plaintiff or Yvonne had knowledge of all the facts surrounding Walter's act of pledging Plaintiff's CDs as collateral for his commercial loan. Plaintiff asserts it did not have knowledge of Walter's act until Yvonne attempted to withdraw the CDs at the end of their term in late October 2005. Defendant presents no evidence to place this fact in dispute. Instead, Defendant asserts that it will learn through discovery that Yvonne had knowledge due to an alleged conversation between her and Olzem that purportedly occurred in July 2005. Yvonne, however, denies that such a conversation occurred, and Dunkelberg's January 3, 2006, letter further contradicts Defendant's assertion because the letter states, "All of our discussions and negotiations were with Walter Zaremba, never with his wife or his son."

To the extent that Defendant asserts its position is supported by *Inn Foods*, which is not binding precedent on this Court, the company's board of directors was informed of the president's action and then ratified that action. Defendant has not presented any evidence to the Court, in this case, that Walter informed Plaintiff of his actions, or that Plaintiff knew of Walter's actions before the two bank resolutions were signed.

Additionally, a careful review of the language in the bank resolutions indicates that signing of the bank resolution ratifies all transactions purportedly done on Plaintiff's behalf with CSB before the resolutions were signed. Defendant fails to persuade the Court that pledging Plaintiff's CDs as

16

collateral for Walter's personal commercial loan, which ultimately paid proceeds to Zada, was for the benefit of Plaintiff. Accordingly, the Court finds that as a matter of law neither Plaintiff nor Yvonne ratified Walter's act of pledging Plaintiff's CD as collateral for Walter's commercial loan.

*(c).* ***June 2007 and February 2008 Agreements***

Additionally, Defendant argues that Plaintiff ignores the fact that the parties entered into two agreements whereby the Pension Plan CD was to remain on deposit at CSB pending court order and, therefore, Defendant has the right to deny Plaintiff's withdrawal. Upon review of the two agreements, the Court finds that both agreements contain language stating that Plaintiff did not waive any rights, claims, or defenses with respect to the CDs, and that Plaintiff expressed in both agreements that CSB had no right of ownership over the CDs. Thus, this does not support Defendant's argument because Plaintiff still acknowledged at the time of entering into both agreements that a breach may have occurred when Defendant denied Plaintiff's attempted withdrawal of the two CDs.

*(d).* ***Conclusion***

Accordingly, the Court concludes that Defendant did not have the contractual right to deny Plaintiff and Yvonne the right to withdraw the CDs from Defendant because Walter lacked apparent authority to pledge the CDs as an agent of Plaintiff, and Plaintiff did not later ratify Walter's act. As to damages, Plaintiff alleges that it has suffered more than $2 million in damages as a direct and proximate result of CSB's breaches of contract. However, when deciding a motion for summary judgment, Plaintiff must show the Court there is no genuine dispute as to damages. *See* Fed. R. Civ. P. 56(a). Plaintiff has failed to bear its burden on the exact damages that Plaintiff suffered as a result of the breach. Plaintiff only attached the CDs documentation to its motions, which indicates the

17

principal value of the CDs.  The Court is not clear on Plaintiff's damages at the time of the breach.

 Therefore, the Court grants Plaintiff's motion for summary judgment with respect to its breach of

contract claim (Count II), but a genuine dispute still exists regarding the correct calculation of

damages suffered by Plaintiff.

**2.**      **Count I: Conversion**

*(a).*      ***Common Law Conversion Claim***

"Conversion is an unauthorized and wrongful exercise of dominion and control over

another's personal property in a manner inconsistent with the rights of the owner." *Sackner Prods.,*

*Inc. v. Comtesa, Inc*., No. G89-30212-CA, 1990 U.S. Dist. LEXIS 12438, at *6 (W.D. Mich. Sept.

12, 1990) (*citing Citizens Ins. Co. v. Delcamp Trucking Ctr., Inc*., 444 N.W.2d 210, 213 (Mich. Ct.

App. 1989)). *See also Rib Roof Metal Sys.*, 2008 U.S. Dist. LEXIS 66894, at *37 (citing *Murray Hill*

*Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 636–37 (6th Cir. 2001)) (common law

conversion under Michigan law is defined by "any distinct act of domain wrongfully exerted over

another's personal property in denial of or inconsistent with the rights therein.").  Moreover, a claim

for "conversion of money cannot be maintained unless the defendant had a specific obligation to

return money entrusted to [the plaintiff]." *Martell v. Turcheck*, No. 07-14068, 2008 U.S. Dist.

LEXIS 51966, at *29 (E.D. Mich. July 7, 2008) (citation omitted); *Head v. Phillips Camper Sales*

*& Rental, Inc.*, 593 N.W.2d 595, 603–04 (Mich. Ct. App.1999) (citation omitted).

While a check may be the subject of a suit for conversion, checks are considered property

of the designated payee. *Echelon Homes, LLC v. Carter Lumber Co.*, 683 N.W.2d 171, 180 (Mich.

Ct. App. 2004) (holding that plaintiff did not have standing to bring a conversion claim against the

defendant based on conversion of a check because the check was not payable to the plaintiff), *rev'd*

18

*on other grounds at* 694 N.W.2d. 544 (Mich. 2005); *Stewart Title Guar. Co. v. Lockman*, 05-cv-736, 2008 U.S. Dist. LEXIS 23440, at *24 (E.D. Mich. Mar. 25, 2008); *Trail Clinic, P.C. v. Bloch*, 319 N.W.2d 638, 705 (1982). However, "[a]n action for the conversion of bank account funds . . . can be maintained only if there was an obligation on the defendant's part to return or deliver the specific money entrusted to it." *Check Reporting Servs., Inc. v. Mich. Nat'l Bank-Lansing*, 478 N.W.2d 893, 900–01 (Mich. Ct. App. 1991); *AFSCME v. Bank One*, 705 N.W.2d 355, 364 n. 6 (Mich. Ct. App. 2005).

This matter, however, involves two CDs, which are a type of bank account. Defendant denied Plaintiff's withdrawal on the CDs and, ultimately, collected the Special Fund CD to apply towards Walter's debt. Plaintiff argues that the CDs were specific and identifiable property entrusted to Defendant. Thus, Plaintiff avers that Defendant had the obligation to return the specific money in the CDs to Plaintiff. Plaintiff contends that Defendant is similar to the defendant in *Trail Clinic*, who misappropriated checks payable to another party and was held liable for converting such checks. Defendant disagrees that the CDs are similar to a check. Defendant argues that it does not need to return specific and identifiable property to Plaintiff, but instead only needs to return an amount of money equal to the amounts in the CDs. As such, Defendant concludes that Plaintiff may not maintain an action for conversion against it.

Neither party supplied any case law directly on point, nor has the Court located any, that specifically address whether CD accounts are a type of bank account of which Defendant has a specific obligation to return or deliver the balances to Plaintiff. After reviewing Michigan case law involving other types of bank accounts, the Court finds that an action for conversion may not be maintained against Defendant for its allegedly wrongful actions taken against Plaintiff's CDs.

19

In a similar circumstance involving a union's checking account, two union-officers unlawfully transferred money from the union's account, which the officers were not entitled to, and deposited the funds into a new bank account. *AFSCME*, 705 N.W.2d at 357. The Michigan Court of Appeals held that the union could not maintain an action for conversion against the two officers because they did not have an obligation to return any specific and identifiable money, but rather the officers had an obligation to return an amount of money equal to the amount of money withdrawn from the union's checking account. *Id.* at 364 n.6.

A similar result was reached by a federal district court applying Michigan law that involved a plaintiff's escrow account. A defendant and a plaintiff entered into a contract, in which the defendant established an account to keep the plaintiff's money safe and separate. *Ticor Title Ins. Co. v. Nat'l Abstract Agency, Inc.*, No.05-73709, 2007 WL2710113, at *2 (E.D. Mich. Sept 13, 2007). Pursuant to the contract, the defendant created an escrow account to hold the plaintiff's money. *Id.* Later, the defendant erroneously transferred funds from the plaintiff's escrow account containing money deposited by the plaintiff to a third-party's escrow account. *Id.* at *3. The evidence before the court indicated that the third-party was never entitled to the money in the plaintiff's escrow account. *Id.* As such, the court stated that an action for conversion could not be maintained because the defendant's obligation was to return an amount of money equal to the amount of money that he took, as opposed to any specific, identifiable money that he took. *Id.* at *10 n.18 (stating that there is no cause of action for conversion when there was no obligation on the defendant to return specific money entrusted to it).

Moreover, courts in other jurisdictions have reached the same conclusion under similar circumstances. In *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 643 (E.D.N.Y.

20

2000), the court held that a plaintiff could not pursue a claim of conversion arising from a defendant bank's authorization of allegedly improper wire transfers from the plaintiff's checking account. The court explained that "the relationship between a bank and a depositor is the strictly contractual one of debtor and creditor," and as such, any claim against the defendant bank arising from the misappropriation of funds from that plaintiff's account is not for specific and identifiable property belonging to the plaintiff. *Id.* The plaintiff's claim must rest upon the bank's "contractual [] indebted[ness] to the [plaintiff] depositor in the amount of the funds deposited." *Id.*; *Newbro v. Freed*, 409 F. Supp.2d 386, 396 (S.D.N.Y. 2006) ("Ordinarily, when the bank has misused the depositor's money, the depositor's remedy lies in contract—not tort."); *Calisch Assocs., Inc. v. Mfrs. Hanover Trust Co.*, 151 A.D.2d 446, 448 (N.Y. App. Div. 1989) ("[A] customer's bank account is merely a debt owed to it by the bank, and there is no identifiable property which could have been taken by defendant."); *Mijatovich v. Columbia Sav. & Loan Ass'n*, 522 N.E.2d 728, 730–31 (Ill. App. Ct. 1988) (holding that the plaintiffs were limited to breach-of-contract remedies for their claim that a defendant bank had misappropriated funds from their savings account where "the relationship of the parties was that of a creditor and debtor").

Therefore, as explained by Michigan case law and further supported by other jurisdictions, CD accounts are more closely analogous to a checking account or an escrow account where a plaintiff deposits money into a bank account managed by a defendant bank. Here, Plaintiff's deposits of money into the Pension Fund CD and the Special Fund CD were governed by a contractual relationship just like in *Ticor* and *AFSCME*, and Defendant was obligated to act in accordance with the contractual terms governing these CDs. The CD accounts created by Plaintiff signify a debt that Defendant owed to Plaintiff, but the CD accounts do not contain specific and

identifiable property which Defendant could have taken.  Moreover, in *Ticor*, the court made no distinction based on the fact that the money from the escrow account was transferred to a third-party's account; the court still held that an action for conversion could not be maintained. The fact that one CD was collected by Defendant while the other CD remained on deposit with Defendant still leads the Court to the same conclusion.   Therefore, the Court finds that because Defendant owes Plaintiff   an amount of money equal to the amount of money in Plaintiff's CD accounts—rather than specific identifiable money—Plaintiff may not maintain an action for conversion.  Accordingly, Plaintiff is denied summary judgment on its common-law conversion claim.

### *(b).*     *Statutory Conversion Claim*

M.C.L. § 600.2919a provides, in pertinent part:

> (1)   A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a)  Another person's stealing or embezzling property or *converting* property to the other person's own use.
>
> (b)  Another person's buying . . . *converted* property when the person buying . . . , or aiding in the concealment of stolen, embezzled, or *converted* property knew that the property was . . . *converted*.

(emphasis added.)  In order to prevail on a claim for statutory conversion, a claimant must satisfy the elements of a common law conversion claim.  *See, e.g.*, *Rib Roof Metal Sys.*, 2008 U.S. Dist. LEXIS 66894, at *36 ("[A] defendant must know that the property was stolen, embezzled, or converted."); *J&W Transp., LLC v. Frazier*, No. 07-005987-CB, 2010 WL 2178555, at *14 (Mich. Ct. App. June 1, 2010) (unpublished) ("Having concluded that Defendant converted the trucks, the trial court then properly concluded that plaintiffs were entitled to damages under MCL

22

600.2919a(1)(a) because defendants had converted plaintiffs' property to their own use."); *Smith v. Doades*, No. 291026, 2010 WL 3984647, at *4 (Mich. Ct. App. Oct. 12, 2010) (unpublished).

Here, Plaintiff does not allege that Defendant stole or embezzled Plaintiff's CD accounts, but instead alleges that Defendant knowingly converted Plaintiff's CDs. In response, Defendant contends that Plaintiff cannot prove that Defendant knew that the CDs were converted by Walter. Despite the parties' contentions, the Court finds that Defendant has not converted the CD accounts as determined in Subsection IV.A.2(a), *supra*. Since an action for common law conversion may not be maintained against Defendant under the circumstances in this case, pursuant to the plain language of M.C.L. § 600.2919a(1)(a), Defendant therefore is not liable under Plaintiff's statutory conversion claim. Accordingly, Plaintiff's statutory conversion claim fails as a matter of law and Plaintiff is denied summary judgment on Count I.

**3.     Counts VIII and IX**

Although Plaintiff states Counts VIII and IX are requests for declaratory relief, the Court analyzes Counts VIII and IX as asserting three distinct claims against Defendant: (1) unjust enrichment; (2) wrongful detainer; and (3) request for declaratory relief as to whom has legal ownership of the two CDs in dispute. The Court combines the two counts in its analysis because the only distinction between the counts is which CD Plaintiff requests the court to declare ownership.

*(a).     Unjust Enrichment*

It is well established in Michigan that an unjust enrichment claim is an equitable claim, and a contract will be implied to prevent unjust enrichment. *Liggett Rest. Grp., Inc. v. City of Pontiac*, 676 N.W.2d 633, 639 (Mich. Ct. App. 2003); *see, e.g., Michigan Educ. Empl. Mut. Ins. Co. v.*

23

*Morris*, 596 N.W.2d 142, 150 (Mich. 1999). A contract will be implied only if there is no express contract covering the same subject matter. *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. App. Ct. 2003). But, an express contract will not bar an unjust enrichment claim, even when the contract covers the same subject matter, if Defendant was not a party to the contract. *Morris Pumps v. Centerline Piping*, 729 N.W.2d 898, 902 (Mich. Ct. App. 2007).

Plaintiff contends that CSB was unjustly enriched by the following acts: (1) preventing the withdrawal of Plaintiff's funds from its CD; (2) collecting the Special Fund CD, which was paid toward Walter's debt; (3) refusing to reverse the illegal collection; and (4) refusing to allow Plaintiff to place the money in a temporary liquidity guarantee program account. Because of these actions, Plaintiff requests that the Court grant restitution of these funds because of Defendant's unjust enrichment. In response, Defendant argues that Plaintiff's unjust enrichment claim must fail because it does not provide the Court with any factual or legal support for Plaintiff's assertion.

In this case, express written agreements exist between the parties. According to the record, the Court finds a claim for unjust enrichment cannot be maintained because those written agreements cover the same subject matter as Plaintiff's unjust enrichment claim, and the agreements and this action involve the same parties. First, the agreements covered the parties' relationship with respect to Plaintiff's CDs. Second, as receiver for CSB, Defendant stands in the shoes of CSB in this litigation, succeeds to CSB's liabilities, and must pay all of CSB's valid obligations. 12 U.S.C. §§ 1821(e), (g); *Tosco Corp.,* 723 F.2d at 1247 ("It can be said that as receiver the FDIC 'stands in the shoes' of the Bank."). Thus, Defendant and CSB are the same party. In that respect, the express agreements and this action involve the same parties—Plaintiff and Defendant/CSB. Accordingly, Plaintiff may not maintain an unjust enrichment claim, and summary judgment is denied on Counts

24

VIII and IX with respect to Plaintiff's claim for unjust enrichment.

*(b).     Wrongful Detainer*

Plaintiff asserts no factual or legal support for this claim other than placing the words "wrongful detainer" in Counts VIII and IX. Even if wrongful detainer is a separate cause of action, Plaintiff has not supplied any legal support for the proposition that Michigan law supports a claim involving wrongful detainer by a defendant bank. The Court denies Plaintiff's request because Plaintiff has not shown it is entitled to summary judgment.

*(c).     Declaratory Relief*

Under the Federal Declaratory Judgment Act, in an action of actual controversy, the district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 241 (1952)). Thus, district courts have "unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* at 286. When exercising this discretion, the district court should consider whether "'the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).

Plaintiff's Counts VIII and IX request declaratory relief as to whom has ownership of the funds being held by PNC Bank and request an order to return the funds collected by CSB. Plaintiff

argues that when Defendant was appointed as receiver for CSB, the Pension Fund CD was not a CSB asset. Before Defendant's appointment, that CD was ordered by the state court to be moved to National City, which is now PNC Bank. Plaintiff contends that Defendant did not inherit any right to the PNC account, and thus, the Court should declare Plaintiff the sole owner of the PNC account because CSB no longer exists. Defendant responds that the state court's October 13, 2009, order stated that CSB's claim of collateral against the CDs shall follow the funds, and as such, Defendant possesses rights and interests in the proceeds on deposit at PNC Bank.

In this case, the Court declines to determine who has ownership of the funds being held by PNC Bank because such decision will not now serve a useful purpose in settling the legal relations in this action or terminate the proceeding. The Court determined in Section IV.A.1, *supra*, that CSB breached the CD Agreements when it refused to allow Plaintiff to withdraw its CDs and collected the Special Fund CD. Plaintiff may now prove the damages caused from such breach. If the Court were to declare the ownership of the funds on deposit at PNC Bank, it would not settle the legal issue or terminate the proceedings with respect to the other damages that Plaintiff alleges from Defendant's collection of the Special Fund CD. Therefore, the Court declines to declare the relief Plaintiff seeks.

*(d).   Conclusion*

Accordingly, the Court denies Plaintiff's summary judgment motion as to Counts VIII and IX because: (1) as a matter of law, Plaintiff may not assert an unjust enrichment claim under Michigan law when an express contract between the parties exists; (2) Plaintiff failed to demonstrate to the Court that wrongful detainer is a cognizable claim under Michigan law; and (3) the Court declines to declare the ownership of the funds on deposit at PNC Bank.

4.      **Defendant's Request for Additional Discovery**

As to Plaintiff's motion for summary judgment on Counts I, VII, VIII, and IX, Defendant responds that it needs additional time to conduct discovery pursuant to Federal Rule of Civil Procedure 56(f).[10] However, Defendant requests additional discovery only if the Court fails to grant Defendant's request to stay the action while Defendant reviews Plaintiff's administrative claim. On September 23, 2010, the Court granted Defendant's request for a stay of the action. Accordingly, the Court denies Defendant's request for additional discovery pursuant to Fed. R. Civ. P. 56(d).

**B.     MOTION FOR SUMMARY JUDGMENT TO AFFIRM ITS ADMINISTRATIVE CLAIM**

On February 19, 2010, Plaintiff filed an administrative claim with Defendant. More than 180 days have passed since the claim was filed, and Defendant has failed to issue a determination denying or granting Plaintiff's claim. Plaintiff argues that Defendant was required to make a determination according to 12 U.S.C. § 1821(d)(5)(A)(I).[11] Because Defendant did not make a determination, Plaintiff maintains that its claim should be allowed, and thus, this Court should enter a judgment affirming the claim. Defendant rebuts Plaintiff's contention and argues that Plaintiff's interpretation of § 1821(d)(5)(A)(I) is incorrect because other sections of the statute contemplate situations in which a determination is not made.

Despite the parties' arguments, the Court finds it unnecessary to interpret the statutory language of § 1821(d)(5)(A)(I) because Plaintiff's arguments in its first motion for summary

---

[10] Effective December 1, 2010, the analogous language to Rule 56(f) is found in Rule 56(d).

[11] The statute states: "Before the end of the 180-day period beginning on the date any claim against a depository institution is filed with the [FDIC], the [FDIC] shall determine whether to allow or disallow the claim and shall notify the claimant of any determination with respect to such claim." 12 U.S.C. § 1821(d)(5)(A)(1).

judgment are similar to the arguments it raised in its administrative claim, which asserts that Plaintiff's CDs were converted. For the reasons stated above, the Court addressed Plaintiff's breach of contract claim and conversion claims. Therefore, the Court finds it unnecessary to grant Plaintiff's Motion for Summary Judgment to Affirm Its Administrative Claim.

## C.    MOTION TO STRIKE JURY DEMAND

When Plaintiff filed its first-amended complaint on April 19, 2010, it made a demand for a jury. Defendant moves to strike Plaintiff's demand for a jury because Plaintiff waived such rights according to terms contained in various agreements that Plaintiff and Defendant entered into.

Pursuant to Fed. R. Civ. P. 12(f), the Court may order "any redundant, immaterial, impertinent, or scandalous matter" stricken from a pleading. A party using Rule 12(f) must file a motion to strike before responding to the pleading. Parties to a contract may, by a prior written agreement, execute a waiver to the right to a jury trial. *K.M.C. Co., Inc. v. Irving Trust co.*, 757 F.2d 752, 755 (6th Cir. 1985). As the Sixth Circuit has explained, "the constitutional right to jury trial may only be waived if done knowingly, voluntarily and intentionally," and "whether this standard [has been] met in a given case is a constitutional question separate and distinct from the operation of substantive rules of contract law." *Id.* at 755-56.

Specifically, Defendant contends that Plaintiff waived its right to a trial by jury for any dispute with Defendant because it executed the CD Agreements, Signature Cards, and the Bank Resolutions. These documents contained language that Defendant and Plaintiff's relationship would also be governed by the terms in the Deposit Agreement and the Commercial Account Agreement. In response, Plaintiff argues that its managing member and one of its members—Yvonne and James—were not informed or aware they were waiving Plaintiff's right to a jury trial.

28

The Court is not persuaded by Plaintiff's arguments.  The Court finds Plaintiff knowingly, intelligently, and voluntarily waived its right to a jury trial by entering into agreements where the plain language of the agreements waived Plaintiff's right to a jury trial.  First, the parties had equal bargaining power and Plaintiff was under no obligation to establish the CDs with CSB.  The language in the agreements was neither hidden nor difficult to understand.  The CD Agreements' first term stated that the Deposit Agreement also governed Plaintiff's CDs.  The third and fourth sentence in the CD Agreements' first term state: "You have received a copy of [the Deposit Agreement], the Truth in Savings disclosures . . . , and the fee schedule.  You have read them and agree to them."  Under the section "Jury Waiver," in the Deposit Agreement, Plaintiff agreed to "waive [its] right to a jury trial in any dispute with [CSB].  Such disputes may be tried before a judge only."  The Commercial Account Agreement has the same language near the top of page one.

Second, the fact that Plaintiff's managing member failed to read all of the terms in the agreements is not a reason that compels this Court to find that the terms regarding waiver of a jury trial are void.  *See Nieves v. Bell Indus.*, 517 N.W.2d 235, 238 (Mich. Ct. App. 1994) ("'One who signs a contract cannot seek to avoid it on the basis that he did not read it or that he supposed that it was different in its terms.'") (quoting *Stopczynski v. Ford Motor Co.*, 503 N.W.2d 912, 913 (1993)); *McKinstry v. Valley Obstetrics-Gynecology Clinic, P.C.*, 405 N.W.2d 88, 96 (Mich. 1987) (explaining that Michigan law presumes "one who signs a written agreement . . . understands its contents," which "preserves the integrity and stability of written instruments").  Thus, the Court finds that the term waving Plaintiff's right to a jury trial is enforceable.  Accordingly, Defendant's Motion to Strike Plaintiff's Jury Demand is GRANTED.

## V. CONCLUSION

Accordingly, for the above reasons, IT IS ORDERED that Plaintiff's Motion for Summary Judgment on Counts I, VII, VIII, and IX [dkt 10] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Defendant's request for additional discovery is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment to Affirm its Administrative Claim [ dkt 24] is DENIED as moot.

IT IS FURTHER ORDERED that Defendant's Motion to Strike Jury Demand [dkt 9] is GRANTED.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  February 23, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on February 23, 2011.

S/Marie E. Verlinde
Case Manager
(810) 984-3290

30